IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANDREA WILLIAMS,

                              Petitioner,                    OPINION AND ORDER

          v.                                                      09-cv-204-slc

PETER HUIBREGTSE, Warden,
Wisconsin Secure Program Facility,

                              Respondent.

---

On October 5, 2004, a La Crosse County, Wisconsin jury found Andrea Williams guilty

of first degree recklessly endangering safety when he beat and stabbed his ex-girlfriend, Stephanie

Hoeppner, in a fit of jealous rage on November 14, 2003.  Williams was sentenced to 15 years

in prison followed by a period of five years extended supervision.  After unsuccessfully appealing

his conviction and the denial of a subsequent motion for post-conviction relief in the Wisconsin

courts, Williams filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]

Williams alleges that his confinement resulting from his October 2004 conviction is in

violation of the United States Constitution.  Specifically, petitioner contends that:

> 1) his trial lawyer was ineffective for failing to object to certain statements made
> by the prosecutor during her closing argument;
>
> 2) the trial court improperly denied petitioner's request to change counsel on the
> second day of trial;
>
> 3)  his post-conviction/appellate lawyer was ineffective for failing to argue during
> the direct appeal that petitioner's trial lawyer had a conflict of interest in
> representing petitioner;

---

[1]Petitioner originally filed his petition in the federal district court in the Eastern District of
Wisconsin.  That court transferred the petition to this court on April 6, 2009.  A copy of the petition can
be accessed electronically on that court's docket sheet, case 09-cv-329.

4) his post-conviction/appellate lawyer was ineffective for failing to argue during the direct appeal that his trial lawyer had been ineffective for not objecting to the submission of first-degree recklessly endangering safety as a lesser-included offense of attempted homicide;

5) his post-conviction/appellate lawyer was ineffective for failing to argue that the circuit court erred in excluding testimony from the victim about petitioner's intent to kill her; and

6) (*a*) the trial judge was biased against petitioner, as evidenced by two remarks he made at trial and sentencing, and (*b*) trial counsel was ineffective for failing to ask the judge to recuse himself.

The state concedes that Williams exhausted his available state court remedies on these claims and filed his petition within the one-year period specified by 28 U.S.C. § 2244(d)(1)(A). It contends that all but the judicial bias claim must be denied under § 2254(d) because the last state court that adjudicated these claims--the Wisconsin Court of Appeals– did not make any unreasonable findings of fact or apply clearly established Supreme Court law in an unreasonable manner when it denied the claims and affirmed the conviction.  With respect to the judicial bias claim, the state contends that Williams has procedural defaulted the claim by failing to present it to the state court of appeals during either of two trips through the state appellate system.

Having read the entire record and having considered the parties' arguments, I find that Williams has not come close to meeting his heavy burden to show that the state court of appeals unreasonably decided the facts or unreasonably applied federal law in rejecting his claims.  As for the judicial bias claim, I am not convinced that it is procedurally defaulted but I am rejecting this claim because it has no merit.  Accordingly, I am denying the petition.

I have drawn the facts that follow from the record of the state court proceedings, dkts. 21-23, 33-34.

FACTS

The state charged petitioner Andrea Williams in an amended information in the Circuit Court for La Crosse County with attempted first-degree intentional homicide while armed and felony bail jumping, both as a repeat offender. The charges arose from a domestic dispute between Williams and his girlfriend at the time, Stephanie Hoeppner. The complaint alleged that Williams had punched, kicked and stabbed Hoeppner.

The state filed a pretrial motion asking the court to exclude Hoeppner's opinion whether Williams intended to kill her when he stabbed her. Over Williams's objection, the court granted the motion, on the ground that such testimony would be an improper lay opinion on a question the jury had to decide. It explained, however, that defense counsel was free to ask the victim questions about Williams's statements and actions before and after the stabbing to attempt to show that he did not mean to kill her. Tr. of Hrg., Oct. 1, 2004, dkt. 33, exh. HH, at 15-18.

The case went to trial on October 4 and 5, 2004. Williams was represented by Sean O'Neill. Judge Michael Mulroy presided over the trial. Williams did not testify.

During his opening statement, O'Neill suggested to the jury that it was unclear how Hoeppner had been stabbed:

> Now, this wound; Stephanie remembers being on the kitchen floor. Actually the fight had moved into the kitchen. Stephanie was curled up on the floor and she felt a wetness on her back. Okay. She thought that she had actually rolled into a puddle on the floor. She didn't feel a knife. She didn't feel anything actually. She didn't feel any pain in her back at all. Okay. But when she discovered blood, of course she knew that something was wrong. She did not see a knife in my client's hand prior to that time and she didn't see my client stab her. So what happened isn't entirely clear. And again, the State has to prove beyond a reasonable doubt that my client stabbed Stephanie Hoeppner.

3

Tr. of Jury Trial, Oct. 4, 2004, dkt. 34, exh. JJ, at 16-17.

He also focused the jury's attention on the issue of intent:

> More importantly, his reaction to the situation. I can't believe I
> did this. I can't believe it. I'm sorry. I didn't mean it. He was
> horrified by what had happened and he was sorry and he didn't –
> that knife did not go into her again. She wasn't stabbed again.
>
> I think the evidence will show that [Williams] was screaming.
> That he had a feeling of helplessness and that's also important
> because it goes to intent. Okay. If you find that he stabbed her
> that's not all–that's not the end of your inquiry. Okay. You have
> to find what his intent was. Did he intend to hurt her or did he
> intend to kill her? Okay. If he intended to hurt her then it's not
> attempted murder.

> *Id*. at 17.

Hoeppner offered the following unchallenged account of events: Williams was at her home on November 14, 2003 when she received a phone call from a male friend. After she hung up the phone, Williams became extremely angry and accused Hoeppner of having sex with the other man. Williams began yelling at Hoeppner and hitting her in the head with his fists. Hoeppner ended up on the floor, where Williams stomped on her. At some point, the fight moved from one part of the home to the kitchen, where Hoeppner ended up on the floor again. While curled up on the floor attempting to protect herself with her hands over her head, Hoeppner felt something wet on her back. She reached her hand around to her back to feel it and when she drew her hand back she saw that it was full of blood. "At one point" she saw Williams with a kitchen steak knife in his hand. According to Hoeppner, Williams said, "I just stabbed you. I can't believe I just stabbed you."

Hoeppner was able to get up from the floor. She stood facing Williams and grabbed onto his wrists; Williams was holding the knife. When she asked him to put it down, Williams said

4

he did not want to because he did not trust her.  Hoeppner tried to calm Williams down and asked him to take her to the hospital; Williams was concerned that he would get in trouble if he did.  The two continued to argue and discuss the situation until they eventually left in Hoeppner's car, with Williams driving.  Williams eventually dropped Hoeppner off at an urgent care clinic in Onalaska, then sped off in her car.

Hoeppner was transported by ambulance to the hospital, where she was treated for a 1 ½ centimeter-wide stab wound to her lower back, a closed head injury and bumps and bruises, including a tread mark across her face.  Williams was caught by sheriff's deputies early the next morning while speeding westbound on I-80 through Nebraska.

The main factual dispute at trial was the seriousness of the stab wound.  The state called Dr. Kenneth Hartman, Jr., a surgery resident who examined and treated Hoeppner's wound.  Hartman testified that a CT scan showed that the knife had narrowly missed striking Hoeppner's right kidney and major blood vessels nearby.  In his opinion, stabbing a person in the area where Hoeppner had been stabbed created a substantial risk of death because of the vascular structures in the area.  The defense called its own expert who offered his opinion that the wound as inflicted did not cause a substantial risk of death, although he acknowledged that more serious damage could have occurred if the blade had penetrated more deeply.

On the morning of day of the second day of trial, the parties met with Judge Mulroy outside the presence of the jury.  The prosecutor reported that the local newspaper had published an article about the case containing information that had not been introduced in the trial.  At Williams's request, the judge brought the jurors into the courtroom and asked them if anyone had read the article; no one said s/he had.

O'Neill then asked the court to excuse the jury again.  After they left the courtroom, he informed the court that Williams was upset about the article, and that when O'Neill told him the court had no control over the press, Williams had told him that he did not want him to represent him anymore.  In response to questions from the court, Williams outlined various complaints about O'Neill's representation and stated his belief that he was not getting a fair trial.  The following exchange then occurred between Williams and the court:

THE COURT:        So you want to represent yourself?

DEFENDANT:        No, I feel like I need to get –

THE COURT:        That's your option.

DEFENDANT:        That's my option?

THE COURT:        Yep.  We're not going to – as far as I'm concerned this is an attempt to delay the inevitable, Mr. Williams.   Mr. O'Neill has, throughout these proceedings, represented you aggressively.

DEFENDANT:        Mm-hmm.

THE COURT:        He's brought in issues that I have denied his requests on.  He certainly was appropriate in bringing them.  I think he's done a good job for you . . . at least as far as my observation of Mr. O'Neill in this case, he's conducting an aggressive defense of you.  You should be happy to have him as your counsel, I think.

As far as what we are going to do now; there are two options.  I'm not going to declare a mistrial [on the basis of the media coverage] .  . We're either going to proceed with Mr. O'Neill continuing his representation of you or you're going to proceed without counsel.

DEFENDANT:        So it's okay for the media to print slander in the newspaper?

6

THE COURT:          You want to sue 'em, go ahead and sue 'em.  But,
                    that's not a part of this trial.

DEFENDANT:          Go ahead with Sean O'Neill.

       Tr. of Jury Trial, Oct. 5, 2004, dkt. 34, exh. KK, at 108-109.

       During her closing argument, the prosecutor made the following remark, with no objection by O'Neill:

> The defense told you in their opening statement that when he grabbed that knife he only meant to hurt her.  Ladies and gentlemen, he'd already hurt her, and you know it.  He had already hurt her.  He wanted more.  Hurting her was not enough.

*Id*. at 163-64.

       During his closing, O'Neill suggested briefly that the state had not proved that it was Williams who had stabbed Hoeppner:

> We don't know exactly what happened.  [Hoeppner] said she felt a wetness.  She said she didn't see the knife in my client's hand, although I don't know how she couldn't because she was laying on her back.  So, those are questions you'll have to answer.

*Id*. at 170.

In the remainder of his closing, however, O'Neill focused on the intent issue, arguing that if Williams stabbed Hoeppner, then he did not intend to kill her.  He also argued that Williams's conduct did not amount to the lesser-included crime of reckless endangerment because it did not create a risk of death or great bodily harm.

       The jury found Williams not guilty of attempted murder but guilty of first degree reckless endangerment and bail jumping.

After his conviction and sentencing, Williams filed a motion for postconviction relief in La Crosse County Circuit Court. Williams was represented by Assistant State Public Defender Martha K. Askins. In the motion, Williams alleged that O'Neill had been ineffective for not asking Judge Mulroy to recuse himself on grounds of bias after he characterized Williams's request for a new attorney as an attempt to "delay the inevitable." He also argued that O'Neill should have objected to the prosecutor's closing argument and asked for a mistral. Williams contended that the prosecutor had misstated the defense position because counsel had never admitted in his opening statement that Williams had grabbed the knife or stabbed Hoeppner. Finally, Williams claimed that the judge had abused his discretion in denying Williams's request for a new lawyer on the second day of trial.

The court held an evidentiary hearing, at which O'Neill testified. O'Neill said he had been careful in his opening and closing not to concede that Williams had stabbed Hoeppner. He explained that he took this approach because the issue was important to Williams, although O'Neill himself "didn't see it as a winning defense in any way, shape, or form." Tr. of Postconviction motion hrg., Sept. 12, 2005, dkt. 34, exh. MM, at 15. He agreed that the prosecutor had inaccurately represented the defense's position during her closing argument, but in O'Neill's view, it was a "fairly innocuous" statement that did not warrant an objection because the evidence showing that Williams stabbed Hoeppner was overwhelming. *Id*. at 16-17, 20. He explained that he wanted the jury to focus on Williams's intent and the actions he took after the stabbing, which were more legitimate issues for the defense than whether Williams stabbed the victim. *Id*. at 18-19. With respect to the court's remark about delaying the "inevitable," O'Neill said he interpreted it merely as the court indicating that Williams was trying to prevent the case ending with a verdict.

The court orally denied the motion for relief, finding that O'Neill's failure to object to the prosecutor's closing was a reasonable tactical decision. The court explained that when it had used the term "inevitable," it meant "to bring the case to a conclusion with a jury verdict." *Id*. at 37.

With Askins continuing as his counsel, Williams pursued a direct appeal from his judgment of conviction and the denial of his postconviction motion. He raised two issues on appeal: (1) he was deprived of effective assistance of counsel when O'Neill failed to object to the prosecutor's description of Williams's defense during closing argument; and (2) the trial court had erred in denying Williams's request for new trial counsel, made on the second day of trial. On August 10, 2006, the Wisconsin Court of Appeals issued an unpublished opinion affirming Williams' conviction and the order denying his postconviction motion. The Wisconsin Supreme Court denied Williams's petition for review of the court of appeals' decision.

Williams then filed in the circuit court a pro se motion for collateral postconviction relief, pursuant to Wis. Stat. § 974.06. He alleged that Askins had provided constitutionally defective performance when she failed to pursue certain arguments and claims in the original postconviction motion and direct appeal proceedings. After the circuit court denied the motion without an evidentiary hearing, Williams appealed. He argued that Askins had been ineffective by failing to raise the following claims: (1) O'Neill had had a conflict of interest; (2) O'Neill was ineffective in failing to object to the submission of first-degree recklessly endangering safety as a lesser-included offense; and (3) the circuit court had erred in excluding opinion testimony from the victim regarding Williams's intent to kill her.

9

The Wisconsin Court of Appeals rejected Williams's ineffectiveness arguments and affirmed the denial of his § 974.06 motion in an unpublished opinion issued November 6, 2008. The Wisconsin Supreme Court denied Williams's petition for review.  Williams then filed the present federal habeas corpus action, advancing the same issues he raised in his direct appeal and in the § 974.06 proceedings, as well as a claim of judicial bias.

OPINION

I.   AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs review of state court convictions in federal habeas corpus proceedings.  Pursuant to the AEDPA, a federal court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 376 (2000).

To grant habeas relief under the "contrary to" clause, a federal court must find that the state court reached a result opposite to that reached by the Supreme Court on materially indistinguishable facts. *Williams*, 529 U.S. 362 at 405; *Jackson v. Miller*, 260 F.3d 769, 774 (7th Cir. 2001).  To obtain relief under the "unreasonable application" clause, a habeas petitioner must show that the state court's decision unreasonably extended a clearly established Supreme Court precedent to a context where it should not have applied or unreasonably refused to extend such precedent to a context where it should have applied. *Jackson*, 260 F.3d at 774.  A state

10

court's factual findings are presumed correct unless the petitioner presents clear and convincing evidence showing that the findings were wrong. 28 U.S.C. § 2254(e)(1). To prevail on this prong, a petitioner must show that the state court's decision was so erroneous as to be objectively unreasonable, that is, well outside the boundaries of permissible differences of opinion. *Emerson v. Shaw*, 575 F.3d 680, 684 (7th Cir. 2009).

II. Ineffective Assistance of Trial Counsel--Failure to Object to Prosecutor's Characterization of the Defense During Closing Argument

As he did in state court, Williams contends that O'Neill was ineffective because he failed to object to the prosecutor's closing argument suggesting that Williams had conceded stabbing Hoeppner. To prove that O'Neill was ineffective, Williams must show first, that O'Neill's performance was deficient, and second, that the deficient performance prejudiced Williams. *Strickland v. Washington*, 466 U.S. 668 (1984). When assessing counsel's performance, the court presumes that counsel's conduct was reasonable and the court does not second-guess counsel's reasonable, strategic decisions. *Strickland*, 466 U.S. at 689. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

On habeas review, the bar is even higher: the petitioner do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance; he must show that the state courts applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Showing that a state court applied *Strickland* unreasonably is extraordinarily difficult because *Strickland* calls for inquiry into

11

degrees.  This means that only a clear error in applying *Strickland*'s standard will support a writ of habeas corpus.  *Holman v. Gilmore*, 126 F.3d 876, 882 (7th Cir. 1997); *see also Knowles v. Mirzayance*, ___ U.S. ___, 129 S.Ct. 1411, 1420 (2009)("the question is not whether a federal court believes that the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable–a substantially higher threshold").

Addressing Williams's claim, the Wisconsin Court of Appeals first recognized that it was controlled by *Strickland*, then accurately recited the two prongs of the test.  *State v. Williams*, 2005AP2454-CR (Ct. App. Aug. 10, 2006), dkt. 21, exh. H, at ¶2.  The court found no deficient performance by O'Neill when he failed to object:

> The prosecutor did not significantly misstate the defense's opening statement or the theory of defense.  The only reasonable inference from defense counsel's opening statement is that Williams did stab the victim, but he was horrified because he did not intend to stab her.  To the extent Williams is complaining that his trial counsel was pursuing what was in Williams's view an improper trial strategy, we disagree.   The trial strategy that Williams's counsel was pursuing was not unreasonable in light of evidence showing that Williams was beating the victim when the victim noticed she was bleeding and saw Williams standing over her with a knife.  There was no evidence to suggest that anyone else was present or that anyone other than Williams was the perpetrator.  Thus, the only viable defense available to Williams was that he did not intend to stab the victim and he did not intend to kill her.  The prosecutor's argument, while not precise, effectively captures the gist of this defense.

> *Id*. at ¶4.

This analysis was well within the bounds of reasonableness.  As O'Neill explained at the hearing on Williams post-conviction motion, the "Williams didn't stab her" defense had no legitimate chance of succeeding  in light of the uncontroverted facts:  Hoeppner was stabbed; Williams was holding a steak knife; Williams said "I can't believe I stabbed you;" Williams was

the only other person there; Williams fled and eventually was arrested while fleeing westward in Hoeppner's car. It may be true, as Williams argues, that O'Neill did not "technically" concede the point during his opening, but it was plain from the evidence and O'Neill's opening and closing that Williams had no bona fide total innocence defense. As O'Neill accurately observed, had he doggedly pursued this irrational contention, he would have undermined the credibility his only legitimate defense, that Williams did not intend to kill Hoeppner when he stabbed her. In light of this, the court of appeals correctly concluded that O'Neill had exercised reasonable professional judgment by choosing not to object.

It is worth observing that the only reason O'Neill did not concede to the jury that Williams had stabbed Hoeppner was to appease Williams. Williams, however, did not have the constitutional right to have O'Neill pursue a frivolous defense. *Fuller v. United States*, 398 F.3d 644, 652 (7th Cir.2005) (quotation removed) (lawyer "has no duty to make a frivolous argument"). Having no viable basis for claiming that he did not stab Hoeppner and no right to insist that his lawyer do so, Williams could not possibly have been harmed--at least not in the constitutional sense-- by the prosecutor's suggestion that he had conceded the point.

III. Denial of Mid-Trial Request for New Counsel

In *Morris v. Slappy*, 461 U.S. 1 (1983), the Supreme Court held that a state trial court had not violated a defendant's Sixth Amendment right to counsel when it denied his request for a continuance to allow better preparation by his lawyer, who had been appointed to represent the defendant six days before trial when his original lawyer had to undergo emergency surgery. The Court wrote:

13

Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel. Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay" violates the right to the assistance of counsel.

*Id*. at 11-12 (internal citations omitted).

The Court found that the trial court was justified in denying the continuance when replacement counsel assured the court that he was ready to try the case and saw no need for a continuance, and defendant had not specifically identified a concern for continued representation by original counsel until the third day of trial. *Id*. at 12. It rejected the court of appeals' holding that the trial court had not given enough consideration to the defendant's desire to be represented by original counsel, rejecting the notion that the Sixth Amendment encompasses a right to a "meaningful attorney-client relationship." *Id*. at 13-14.

Without citing *Slappy* or identifying any other controlling Supreme Court authority, Williams contends that the state court of appeals acted unreasonably by upholding the trial court's refusal to grant him a new lawyer on the second day of trial.[2] Williams is incorrect. The appellate court recognized the constitutional implications of Williams's claim, observing that under the Sixth Amendment, a defendant has a qualified right to representation by his lawyer of choice. *State v. Williams*, dkt. 21, exh. H at ¶5 (citing *State v. Wanta*, 224 Wis. 2d 679, 702,

---

[2]   The court of appeals noted that Williams did not specifically ask for a new lawyer but found such a request implicit in his statement that he wanted to fire O'Neill.  This is a reasonable inference.

592 N.W. 2d 645 (Ct. App. 1999)).  *Accord  Powell v. Alabama*, 287 U.S. 45, 53 (1932).  It also

recognized that granting Williams's request would have meant delaying the trial.  Accordingly,

it looked to the Wisconsin Supreme Court's decision in *State v. Lomax*,146 Wis. 2d 356, 360,

432 N.W. 2d 89 (1988), which listed six factors Wisconsin courts are to consider when faced

with a substitution request that might delay the trial:  (1) the length of the delay requested; (2)

whether counsel has associates prepared to try the case in his or her absence; (3) whether other

continuances have been requested and received by the defendant; (4) the convenience or

inconvenience to the parties, witnesses and the court; (5) whether the delay seems to be for

legitimate reasons or whether the delay is dilatory; and (6) other relevant factors.

   The court of appeals found no impropriety on the part of the trial court in denying

Williams's request:

> The circuit court listened at length to Williams's complaints about
> his attorney. Although the court did not comment explicitly on
> each of the *Lomax* factors, the record persuades us that the court
> considered the appropriate factors and gave an adequate
> explanation for denying the request.  The court explained that it
> was not going to stop the trial midway through because Williams
> did not have a legitimate reason for the delay; that is, Williams's
> request for a new attorney was based primarily on Williams's
> unhappiness with a newspaper article about the case, which the
> court accurately observed was not within the court's control.
> Williams argues that the court improperly treated his request for
> new counsel as a request to proceed pro se.  We disagree.  The
> court simply stated the obvious. Because it refused to delay the
> trial-and witnesses were going to continue to be called in short
> order-Williams would have to represent himself if he fired his
> attorney.

> *State v. Williams*, dkt. 21, exh. H, at ¶6.

   Although the Wisconsin Court of Appeals focused on *State v. Lomax*, a Wisconsin case,

and did not cite federal cases, that omission is not enough to show that its decision was contrary

to clearly established federal law.  *Bell v. Cone*, 543 U.S. 447, 455 (2005) ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court does not have to cite to Supreme Court "cases-indeed, [§ 2254(d) ] does not even require awareness of [the Supreme Court] case, so long as neither the reasoning nor the result of the state-court decision contradicts them").  In *Lomax*, the Wisconsin Supreme Court cited *Slappy* and noted that the factors the court was citing were designed to "balance[] the defendant's constitutional right to counsel against societal interest in the prompt and efficient administration of justice." 146 Wis. 2d at 361, 432 N.W. 2d at 91.  *Lomax* is entirely consistent with *Slappy*.

The court of appeals did not unreasonably apply *Slappy*'s principles in rejecting Williams's claim.  "Unless there is a demonstrated conflict of interests or counsel and defendant are embroiled in an 'irreconcilable conflict' that is 'so great that it resulted in a total lack of communication preventing an adequate defense,' there is no abuse of discretion in denying a motion for new counsel."  *United States v. Morris*, 714 F.2d 669, 673 (7th Cir. 1983).  As the state trial and appellate courts noted, although Williams made a number of general complaints about O'Neill's performance, he never alleged that he and O'Neill had an irreconcilable conflict. To the contrary, the state court of appeals reasonably found that what prompted Williams to complain about O'Neill was the unfavorable newspaper article, which of course, had nothing to do with O'Neill.  To the extent that Williams had other issues with O'Neill that might have arisen earlier, he did not voice them until the state had rested and O'Neill was preparing to put on the defense.  The state courts properly concluded that such "ethereal distrust" was not a sufficient basis for stopping the nearly-complete trial and appointing new counsel.  *Id*.

In sum, there is no basis to find that the trial court either "arbitrarily insist[ed] upon expeditiousness" or that Williams's request for delay was justifiable. Accordingly, the state court of appeals properly concluded that the trial court did not violate Williams's Sixth Amendment right when it denied his request for new counsel and informed him that if he insisted on firing O'Neill, he would have to proceed *pro se*.

## VI. Ineffective Assistance of Postconviction / Appellate Counsel

Williams contends that Askins was ineffective for failing to raise the following three claims during the initial post-conviction proceedings and then on direct appeal: (1) O'Neill had had a conflict of interest; (2) O'Neill was ineffective for failing to object to the submission of first-degree recklessly endangering safety as a lesser-included offense; and (3) the circuit court erred by excluding opinion testimony from Hoeppner regarding Williams's intent to kill her. Williams presented these claims to the Wisconsin Court of Appeals in his appeal from the denial of his § 974.06 motion.

Claims of ineffective assistance of appellate counsel are governed by *Strickland*'s two-part test. As in the trial context, courts "indulge a strong presumption that the petitioner's counsel was constitutionally effective." *Mason v. Hanks*, 97 F.3d 887, 892 (citing *Strickland*, 466 U.S. at 688). In the appellate context, it is well-settled that an attorney does not need to raise "every non-frivolous issue under the sun" in order to be effective. *Jones v. Barnes*, 463 U.S. 745 (1983). *See also Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000) ( "[A]ppellate lawyers are clearly not incompetent when they refuse to follow a 'kitchen sink' approach to the issues on appeals"). Indeed, "[o]ne of the principal functions of appellate counsel is winnowing the potential

claims so that the court may focus on those with the best prospects." *Page v. United States*, 884 F.2d 300, 302 (7th Cir.1989).  Although counsel's selection of the issues to be pursued on appeal is not beyond scrutiny, the court will find a Sixth Amendment violation only when counsel, without legitimate strategic purpose, omits a significant and obvious issue that may have resulted in a reversal of the conviction or an order for a new trial.  *Mason*, 97 F.3d at 893 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

A.  O'Neill's alleged conflict of interest

Williams says Askins should have argued that O'Neill had a conflict of interest in representing Williams at trial.  According to Williams, O'Neill had a conflict because a different lawyer at his firm represented the victim's mother and sister in an unrelated matter.  It appears that the issue was raised at the prosecutor's instance at a hearing in December 2004, at which the prosecutor and trial court both indicated that they were not sure that the situation gave rise to an actual conflict.  Nonetheless, Williams proceeded to state that he waived any conflict. (The transcript from this hearing is not in the record.  However, I have accepted as true the procedural facts proffered by Williams in his petition, at pp. 18-20.)

Williams now claims that his waiver was uninformed and that the conflict adversely affected O'Neill's performance in numerous ways.  The Wisconsin Court of Appeals was not convinced that there was a conflict, and in any case, saw no reason to second-guess Askins's decision to forego the issue on direct appeal.  It wrote:

> First, we note that Williams does not adequately explain why he believes there was a conflict of interest.  Although an attorney who worked at the same firm as Williams's trial counsel had represented

18

the victim's family in the past, Williams has not explained how this impaired his attorney's ability to impartially assist Williams, particularly where Williams explicitly waived the potential conflict of interest in open court. In addition, Williams's postconviction counsel explained in a letter that she sent to Williams that she had several valid strategic reasons for not arguing that trial counsel had a conflict of interest:

> I have several reasons for not raising this claim. First, you have told me that when you called your lawyer, many times [the victim] was in the office. He told me that is a lie. I do not want to question your lawyer on the stand and have him say that you are a liar as that will taint all other issues. Second, even if there was a conflict of interest, I see no way in which your lawyer's handling of the case was affected. [The victim] was actually almost an advocate for you in your case, and I can see why your lawyer would not want to attack her too strongly on cross-examination. After all, as you will recall, she asked the judge to give you a much lighter sentence. Finally, I just don't see the conflict of interest. I see no reason why the firm could not represent you in a criminal case as well as [the victim's] family in a non-criminal matter.

Because Williams's attorney had valid strategic reasons for not raising the conflict-of-interest issue despite Williams's desire that she do so, we reject the argument that counsel performed deficiently by failing to raise this argument. *See State v. Evans*, 2004 WI 84, ¶30, 273 Wis. 2d 192, 682 N.W.2d 784 (a defendant does not have the right to insist that particular issues be raised on appeal), abrogated on other grounds by *State ex rel. Coleman v. McCaughtry*, 2006 WI 49, ¶¶ 26-29, 290 Wis.2d 352, 714 N.W.2d 900.

*State v. Williams*, 2007AP2155 (Ct. App. Nov. 6, 2008)(unpublished opinion), dkt. 22, exh. P, at ¶2.

This decision did not contradict federal law or apply it unreasonably. A defendant cannot establish a violation of his right to conflict-free counsel until he shows that his lawyer "actively represented conflicting interests." *Cuyler v. Sullivan*, 446 U.S. 335, 349-350 (1980).

19

An actual conflict of interest exists only if counsel's motivation for his strategic decisions derived from a desire to advance an interest adverse to the petitioner's. *Burger v. Kemp*, 483 U.S. 776, 784-85 (1987). Moreover, an actual conflict of interest means "precisely a conflict *that affected counsel's performance*-as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (emphasis in original).

Askins pointed out in her letter that there was no evidence that O'Neill had an actual conflict of interest. Without more, the fact that a different lawyer at O'Neill's firm represented the victim's mother and sister on an unrelated civil matter in the past does not show that O'Neill was actively representing those interests at the time of trial or that those interests "conflicted" with Williams's interests in his criminal case. Williams points out that the prosecutor and the trial court raised the issue. However, the fact that they were concerned that a conflict *might* exist does not mean that an actual conflict existed. Notably, there is no evidence that the trial court made an actual finding that O'Neill had a conflict of interest.[3]  In other words, it does not matter if Williams did not execute a valid waiver of the conflict because there was no conflict to waive in the first place.

Further, Williams has adduced no evidence that O'Neill's performance was affected adversely by the alleged conflict. He complains that O'Neill refused to call a number of defense witnesses, but none of these witnesses were related to the victim. He raises other general complaints about O'Neill's performance, but he offers no link between this bad performance and the victim's family's interests. All he offers is a "mere theoretical division of loyalties," which

---

[3]According to the petition, the trial court said at the December 17, 2004 hearing that it did not know whether O'Neill's partner's having worked for the victim's family gave rise to a conflict or not.

is not enough to show a Sixth Amendment violation.  Accordingly, I agree with the court of appeals that Askins exercised reasonable professional judgment when she decided not to pursue this claim.

B.  O'Neill's failure to object to submission of first-degree reckless endangerment

Williams next argues that Askins was ineffective for failing to argue that trial counsel was ineffective for not objecting to the submission of first-degree recklessly endangering safety as a lesser-included offense of attempted homicide.  The court of appeals rejected this argument, finding that an objection by O'Neill would have been meritless because the evidence adduced at trial--namely, that Williams stabbed Hoeppner in the back with a steak knife, causing her injury and narrowly missing vital organs--supported the submission of a verdict question on first-degree recklessly endangering safety.  *State v. Willliams*, dkt. 22, exh. P, at ¶3.  It also pointed out that O'Neill had ably defended Williams by convincing the court to also submit second-degree recklessly endangering safety to the jury, even though the jury ultimately found Williams guilty of the more serious charge.  *Id*.  This analysis is correct and needs no further explication by this court.  Askins could not have been ineffective for failing to raise a claim that had no merit.

C.  Exclusion of victim's testimony regarding Williams's intent

Williams challenges Askins's failure to argue that the circuit court erred in excluding Hoeppner opinion that Williams did not intend to kill her.  The court of appeals found that although lay opinion testimony sometimes is admissible under Wis. Stat. § 907.01 (Wisconsin's

version of Fed. R. Ev. 701), the trial court reasonably exercised its discretion by excluding Hoeppner's opinion because Williams's intent was a factual question for the jury to decide. *Id.* at ¶4. The court also pointed out that any error in excluding the testimony would have been harmless, because intent to kill was not an element of first-degree recklessly endangering safety, which was the crime of conviction.

Skipping to the court's second rationale, I agree that any error in excluding the testimony was harmless. Hoeppner's opinion was relevant only to the charge of attempted first-degree intentional homicide, a crime of which Williams was acquitted. The jury did not have to decide whether Williams intended to kill Hoeppner in order to find him guilty of reckless endangerment. Williams was not prejudiced by the exclusion of the testimony.

## V.  Judicial Bias

Finally, Williams contends that the trial judge was biased against him, and that O'Neill should have sought recusal. Williams points to Judge Mulroy's remark that Williams was trying to delay the "inevitable" when he sought new counsel on day 2 of the trial.[4] The state responds that Williams procedurally defaulted his judicial bias claim by failing to present it to the state appellate courts either on direct appeal or on appeal from the denial of his § 974.06 post-conviction motion.

---

[4] As further evidence of bias, Williams point to the judge's statement at the conclusion of the sentencing hearing that Williams was "showing the type of conduct I expected to hear from you." The judge made this remark after Williams started shouting profanities at the judge in response to the sentence imposed. Given the context and the nature of the remarks, it is impossible to find that Judge Mulroy's statements reflect bias. *See* Tr. of Sentencing Hrg., Oct. 18, 2004, dkt. 34, exh. LL, at 30-31. *Liteky v. United States*, 510 U.S. 540, 555-56 (1994) ("expressions of impatience, dissatisfaction, annoyance, and even anger" do not justify requiring recusal).

The procedural default doctrine is a corollary to the rule that a habeas petitioner must exhaust his state court remedies before filing his federal habeas petition.  28 U.S.C. § 2254(b)(1)(A) (habeas petition shall not be granted unless petitioner "has exhausted the remedies available in the courts of the State").  The principles of comity underlying the exhaustion doctrine require the petitioner to give the state courts a "full and fair opportunity to resolve constitutional claims" before raising those claims in a federal habeas petition.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  To comply with this requirement, the petitioner must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  *Id*.; *Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004).  For a Wisconsin prisoner, this means that he must present each of his claims to the Wisconsin Court of Appeals and to the Wisconsin Supreme Court.  *Moore v. Casperson*, 345 F.3d 474, 485-86 (7th Cir. 2003).  When a petitioner fails properly to raise his claims in the state courts and no state procedures remain available for the presentation of such claims, the claim is barred from consideration by a federal habeas court under the doctrine of procedural default.  *Perruquet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004).

A federal court cannot reach the merits of a procedurally defaulted claim unless the petitioner demonstrates (1) cause for the default and actual prejudice from failing to raise the claim as required; or (2) that enforcing the default would lead to a "fundamental miscarriage of justice." *Steward v. Gilmore*, 80 F .3d 1205, 1211-12 (7th Cir. 1996) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)).  To meet the "cause" requirement, there must have been some external impediment that prevented petitioner from raising the claim.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Attorney error that constitutes ineffective assistance of counsel is cause

to set aside a procedural default. *Franklin v. Gilmore*, 188 F.3d 877, 883 (7th Cir. 1999). A fundamental miscarriage of justice is established by demonstrating that it is more likely than not that no reasonable juror would have convicted petitioner in light of any new evidence. *Schlup v. Delo*, 513 U.S. 298, 327 (1990).

Williams contends that his failure to raise his bias claim was the fault of Askins, who abandoned the claim on direct appeal. In reply, the state points out that Williams has offered no reason for his failure to assert the claim later in his § 974.06 motion, which he filed *pro se*. However, this particular challenge to Askins's performance was *not* a claim he could or should have raised in a motion under § 974.06, which is a motion that is filed in the trial court. *State v. Knight*, 168 Wis. 2d 509, 520, 484 N.W. 2d 540 (1992). Under Wisconsin's rules governing post-conviction claims alleging ineffective assistance of counsel, such claims must be brought in the forum in which counsel's alleged deficiency occurred. *Knight*, 168 Wis. 2d at 519. Askins's alleged deficiency--her failure to brief an issue that she had raised during post-conviction proceedings in the trial court--concerns her performance in the court of appeals. *State v. Rothering v. McCaughtry*, 205 Wis. 2d 675, 678-79, 556 N.W. 2d 138 (Ct. App. 1996) (explaining distinction between functions of post-conviction counsel and appellate counsel). Therefore, the procedure for raising that claim was a habeas corpus petition in the court of appeals under *Knight*, not a § 974.06 motion in the trial court.[5]

---

[5] That said, the Wisconsin courts were willing to entertain Williams's claim that Askins should have appealed the pretrial ruling prohibiting Hoeppner from providing opinion testimony, a claim that technically should have been raised in a *Knight* petition. This suggests that the *Knight* ↔ § 974.06 distinction is not always strictly enforced.

Wisconsin imposes no time limits on the filing of *Knight* petitions, so it is possible that Williams could still raise this claim in the state courts.  However, a federal court need not permit a habeas petitioner to return to state court with his unexhausted claims where it is plain that the claims have no merit.  28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269 (2005).  Such is true of Williams's claim that Askins was ineffective for failing to raise the judicial bias claim on direct appeal.  Askins had a legitimate, strategic reason for her decision.  As she explained in a letter to Williams regarding her appellate brief:

> You will notice that I deleted the section relating to the bias of the trial judge.  In writing that section of the brief, I decided that it would hurt your case more than help to include that argument. The reason I say that is two-fold.  First, Judge Mulroy explained his comment about "delaying the inevitable."  While we may not agree with his explanation,, it is a reasonable explanation that I feel certain the Court of Appeals will accept.  Second, my concern is that the court of appeals would be angry about calling Mulroy biased.  If the issue is not a sure-fire winner, it can only hurt your case to accuse the judge of being biased.  I feel your other issues are good ones, and I do not want to hurt your chances by putting in a claim that would make the court mad at you.

> Pet., dkt. 1, E.D. Wis. case 09-cv-329, at 17.

This court will not second-guess appellate counsel's reasonable decisions, as Askins's decision plainly was.  The judicial bias issue would have failed, and raising it would have diminished the force of Williams's more colorable claims.  *Liteky*, 510 U.S. at  555 (neither judicial rulings nor opinions formed by judge as result of current or prior proceedings constitute basis for recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible").  Accordingly, Williams's claim that Askins was ineffective for failing to raise the bias issue has no merit.

CONCLUSION/CERTIFICATE OF APPEALABILITY

The record does not support Williams's contention that the Wisconsin courts unreasonably applied clearly established federal law or unreasonably decided the facts in rejecting his claims. Accordingly, his petition for a writ of habeas corpus must be denied.

The only question remaining is whether to grant a certificate of appealability to Williams. Under Rule 11 of the Rules Governing Section 2254 Cases, I must issue or deny a certificate of appealability when entering a final order adverse to petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted).

Although the rule allows a court to ask the parties to submit arguments on whether a certificate should issue, it is not necessary to do so in this case because the question is not close. Williams's trial lawyer waged a vigorous defense and obtained Williams's acquittal of attempted murder. Appellate counsel presented a focused, well-argued appeal that made the best of the few issues available to her. The state court of appeals applied the correct legal standards and gave thoughtful consideration to Williams's claims. Williams's sole unexhausted claim of judicial bias has no merit. Willliams has failed to make a substantial showing of the denial of a constitutional right.

ORDER

IT IS ORDERED that the petition of Andrea Williams for a writ of habeas corpus is DENIED and petitioner is DENIED a certificate of appealability.   Petitioner may seek a certificate from the court of appeals under Fed. R. App. P. 22.

Entered this 5th day of March, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge